UNITED STATE DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

UP STATE TOWER CO, LLC, and    )
BUFFALO-LAKE ERIE WIRELESS     )
SYSTEMS, CO., LLC,             )
                               )
        Plaintiffs,            )
                               )
        v.                     )    Case No. 1:17-cv-47
                               )
THE VILLAGE OF LAKEWOOD, NEW   )
YORK; THE VILLAGE BOARD OF     )
THE VILLAGE OF LAKEWOOD, NEW   )
YORK; and THE ZONING BOARD     )
OF APPEALS OF THE VILLAGE OF   )
LAKEWOOD, NEW YORK,            )
                               )
        Defendants.            )

## OPINION AND ORDER

Plaintiffs Up State Tower Co., LLC and Buffalo-Lake Erie Wireless Systems, Co., LLC, doing business as Blue Wireless ("Plaintiffs"), seek to place a wireless telecommunications tower within the Village of Lakewood, New York. Plaintiffs filed the instant lawsuit claiming that the Village Board of Trustees ("Village Board" or "Board") and the Village Zoning Board of Appeals ("ZBA") had unreasonably delayed ruling on their application for a use variance. Shortly after Plaintiffs filed suit, the ZBA issued an 11-page written decision (the "Reasoned Elaboration") denying the application. Plaintiffs have since filed an Amended Complaint, challenging not only the delay but also the application denial. For relief, Plaintiffs seek a permanent injunction requiring the Village to grant them the necessary municipal permits.

Now before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, Plaintiffs' motion for summary judgment and corresponding request for injunctive relief is **granted**, and Defendants' motion for summary judgment is **denied**. Other pending motions are addressed below.

**Factual and Procedural Background**[1]

On August 27, 2015, Plaintiffs submitted an application seeking approval for a 100-foot telecommunications tower to be built in a central location in the Village. The application followed Plaintiffs' identification of significant gaps in Blue Wireless's cellular phone coverage. ROD 33-41. Defendants dispute whether there are, in fact, significant gaps in service for Blue Wireless customers within the Village.

In the fall of 2015, Plaintiffs' counsel appeared before the ZBA to discuss the application. ROD 57-70. In response to public criticism about the tower's proposed location, Plaintiffs subsequently asked that consideration of the application be "tabled" while they explored alternative sites. ROD 71. Plaintiffs also asked the Village to provide a list of properties that it would like included in the site evaluation process. *Id.* The Village Clerk responded with a letter explaining that the

---

[1] The factual record in this case derives primarily from the application proceedings before the Village Board and the ZBA, and from the parties' respective statements of material facts. The administrative proceedings are memorialized in the "Record of Decision" or "ROD."

Mayor and the Village Board were not sufficiently familiar with wireless communications and coverage issues to provide such a list. ROD 75.

Plaintiffs reviewed at least nine alternative sites, including two possible co-location sites. ROD 757-758, 802-804. According to Plaintiffs' representations, some potential site owners were not interested in leasing access to their properties. A vacant parcel on Fairmount Avenue was investigated, but the Plaintiffs and the owner were reportedly unable to agree to lease terms. A school bus garage site was considered, but Plaintiffs received no response to their proposal. Plaintiffs also approached the YMCA about a property on Fairmount Avenue but received no response to their proposed lease. ROD 802-804.

Plaintiffs ultimately identified the Lakewood Fire Company property on Glenwood Avenue ("Glenwood Avenue site") as the preferred site. That location had been suggested by the Village's former Mayor. ROD 448, 2090. The Glenwood Avenue site was selected in part because of its distances from residences; its close proximity to railroad tracks and a commercial district; the presence of trees to create a natural buffer; the financial benefit to the Volunteer Fire Company; and the ability to lease the property. ROD 449-450, 759-760. Because the new proposed location was farther away from the target coverage zone and at a lower elevation than the site originally contemplated, Plaintiffs

anticipated a tower height of 180 feet.  ROD 416.

At a Village Board meeting on February 22, 2016, when asked by Plaintiffs' counsel to offer their initial thoughts, three of the five Board members responded positively to the Glenwood Avenue site.  ROD 2259-2260.  Specifically, one Board member noted that "the cell tower is well hidden."  ROD at 2260.  Another believed that "[w]ith the proposed cell tower location back next to the railroad tracks, it should have very little impact on nearby properties."  *Id.*  A third Board member opined that "a cell tower at that site would be the least obtrusive location in Lakewood for [a tower]."  *Id.*  On April 12, 2016, Plaintiffs formally submitted an amended application to construct a 180-foot tower at the Glenwood Avenue site.

In December 2015, after Plaintiffs filed their initial application, the Village enacted Local Law 2-2015 requiring wireless telecommunications tower applicants to provide an $8,500 escrow deposit with any application.  The purpose of the deposit was to offset the cost of hiring a technical consultant to assist the Village with its review of the application.  ROD 96-97. Plaintiffs did not initially provide the $8,500 escrow amount with their amended application, as they believed the demand for a deposit was unlawful.  ROD 220-222.  In a letter dated May 3, 2016, the Village Mayor informed Plaintiffs' counsel that the Village was unable to accept the amended application without the

deposit. ROD 255. The letter did not indicate whether any substantive information was missing. Approximately one month later, Plaintiffs' counsel submitted an escrow check under protest in the amount of $8,500. ROD 285.

In June 2016, the Village adopted Local Law 4-2016, which established a new permit application and review process. ROD 223-242. In a letter dated July 11, 2016, the Village's hired consultant, Center for Municipal Solutions ("CMS"), notified Plaintiffs' counsel that the pending application was incomplete and that additional information was required in order to comply with Local Law 4-2016. Among the new requirements was a $5,000 application fee. ROD 301-303.

On July 26, 2016, Plaintiffs' counsel objected in writing to the application fee, arguing in part that Plaintiffs' application was not subject to a local law imposed after the application was submitted. ROD 411-412. That same day, the Village returned the application fees that were submitted with Plaintiffs' initial application and informed Plaintiffs' counsel that the required fee was $5,000. ROD 306. On August 22, 2016, Plaintiffs' counsel resubmitted those application fees and objected to the Village's enforcement of Local Law 4-2016. ROD 307-309.

On September 7, 2016, the Village Board established itself as the lead agency under the State Environmental Quality Review Act ("SEQRA"), which pertains to the coordinated environmental

review of Plaintiffs' application.  The Village Board also
authorized itself to determine the completeness of the
application.  ROD 413.

On October 4, 2016, the Village Board held a joint workshop
concerning Plaintiffs' application.  The workshop did not allow
for public comment.  Richard Comi, the CMS consultant hired by
the Village, discussed with Board members the items and issues he
felt they needed to consider in making a determination.  Mr. Comi
also advised that Local Law 4-2016 applied to the amended
application.  ECF No. 41-1 at 10.[2]

Plaintiffs submit that under federal "shot clock" law, the
Village had until October 17, 2016 to make a decision on the
application.  Defendants dispute the deadline calculation.  On
October 24, 2016, Plaintiffs' counsel and the Village attorney
agreed by email to a 60-day extension of the "shot clock" to
allow the Village extra time.  Notwithstanding this agreement,
the Village did not agree to Plaintiffs' interpretation of when
the "shot clock" had commenced.  ECF No. 35-8.  The agreed-upon
deadline, acknowledging the "shot clock" dispute, was December
16, 2016.

---

[2] On December 9, 2016, pursuant to a written settlement
agreement arising out of state court litigation between the
parties, the Village agreed to process Plaintiffs' pending
application under the Village Code existing at the time of its
submission.  ROD 798-799.

The ZBA held a public hearing on Plaintiffs' application on
October 20, 2016.  Plaintiffs' counsel appeared to discuss the
application, and delivered a letter discussing various issues
raised at the October 4, 2016 workshop.  ROD 415-420.  The letter
included supplemental information, including a Blue Wireless
Radio Frequency ("RF") analysis and a Federal Communications
Commission ("FCC") compliance report.  ROD 415-434.

During the public hearing, Plaintiffs' counsel discussed the
alleged coverage gap and the corresponding need for a new tower.
Specifically, counsel discussed the RF propagation maps depicting
coverage from the proposed tower at heights of 180 feet and 150
feet, as well as coverage maps from two alternate locations.
Counsel explained that some of the proposed coverage would spill
over into other municipalities, since it is not possible to build
a network that confines itself to municipal boundaries.  ROD 470.
Counsel also argued that the 180-foot tower was needed to
"address the desired coverage objective."  ROD 484.  The ZBA
requested additional information, and asked Plaintiffs to
consider flying a balloon to simulate the tower's location and
height.  Plaintiffs' representative explained that a balloon
float could be performed, and that photographs would be taken
from certain vantage points.  ROD 527.

On October 26, 2016, Plaintiffs conducted a balloon float
and prepared a photo simulation package that included photographs

from 48 different locations.  ROD 578-679.  Plaintiffs also prepared supplemental RF propagation materials, including propagation maps from the Glenwood Avenue site at 10 foot intervals from a height of 180 feet down to a height of 150 feet. ROD 567-577.  The supplemental RF propagation maps indicated that as the tower height was lowered, the population and geographic coverages decreased.  ROD 575.

On November 9, 2016, the ZBA sent Plaintiffs a letter requesting more information.  Apparently unaware that the balloon float had already taken place, the ZBA asked for advance notice of the float so that residents and others could assess the visual impact themselves.  ROD 562-564.  On November 10, 2016, Plaintiffs' counsel responded to the ZBA's letter and attached the completed photo simulations and supplemental RF documentation.  ROD 565-684.

On November 22, 2016, the ZBA reconvened the public hearing. Plaintiffs' counsel again appeared and reviewed the RF propagation maps.  Those maps, he argued, showed a "dramatic" decrease in coverage as the tower height dropped from 180 feet to 150 feet.  ROD 710.  Counsel also explained that Plaintiffs did not analyze below 150 feet because "it's not worth it from a coverage standpoint.  The difference between one-eighty and one-seventy and even down to one-fifty is so dramatic, that it doesn't make sense to do any plots beyond that because it's an

exercise of futility, for lack of a better term." *Id.*

In the course of the hearing, the ZBA again asked for additional information from the Plaintiffs. Among the information sought was consideration of multiple tower locations, as multiple locations would allow for shorter towers. The ZBA also requested propagation modeling for a Village-owned site on Hunt Road in the Town of Busti. ROD 785. On December 6, 2016, the ZBA sent a letter to Plaintiffs reiterating the request for information about the Hunt Road site and seeking other clarifications. ROD 794-795.

Plaintiffs' counsel responded in a letter dated December 30, 2016. ROD 800-807. The letter specifically addressed the question of multiple tower locations, noting first that there were no co-location opportunities. ROD 801 ("There are no towers or other tall structures between existing [towers] and the coverage objective area in Lakewood that could be used by Blue Wireless to address the coverage gap."). Multiple towers would therefore require construction of multiple sites, which according to Plaintiffs would double the project cost and impose "an undue economic burden." ROD 805. Counsel also argued that the proposed, single-tower facility would have a minimal impact on the community. ROD 805-806. With respect to the Town of Busti site, counsel explained that "[a]s stated at prior ZBA meetings, that site is located too far away from the Village center to

provide reliable coverage to the coverage objective area." ROD
804. Finally, the letter asserted that the 60-day extension of
the shot clock had expired. ROD 806-807.

On January 17, 2017, Plaintiffs filed the instant lawsuit
claiming that the federal time period for consideration of the
application had expired, and that the application should
therefore be granted. On January 23, 2017, the Village Board
voted to authorize the ZBA to act as lead agency for the SEQRA
review. Plaintiffs submit that this authorization was enacted
unlawfully as it lacked their consent. Defendants contend that
no consent was required.

The ZBA held a public hearing on February 9, 2017.
Witnesses at the hearing included the former Village Mayor, a
local engineer, and Mr. Comi from CMS. The ZBA also presented a
letter from Mr. Comi, dated that same day, in which he opined
that Blue Wireless's coverage objective could be met by locating
the proposed facility on the Village-owned property in the Town
of Busti. ROD 2199-2200. For support, Mr. Comi cited an
application submitted in 2003. ROD 2199. Plaintiffs contest the
merit of Mr. Comi's conclusion, arguing that his analysis was
based upon information submitted years before by a different
applicant, and did not take into account recent changes in
telecommunications technology.

The ZBA adjourned the hearing after concluding SEQRA and

variance deliberations, and reconvened at a meeting on February 23, 2017.  The ZBA then issued a negative declaration on the use variance pursuant to SEQRA, and denied the application based upon the 11-page Reasoned Elaboration.  Briefly stated, the Reasoned Elaboration concluded that Plaintiffs had failed to prove a coverage gap, had failed to establish that a 180-foot tower was necessary to achieve their coverage goals, and that the chosen site was less feasible and more intrusive than at least one alternative site.  ROD 2243-2253.  The SEQRA determination stated that because the variance was being denied there would be no adverse environmental impact, but if the variance had been granted the ZBA would have found "potential significant adverse impacts on the character of the host community and the enjoyment of the community's amenities."  ROD 2242.

In finding no coverage gap, the ZBA relied in part on statements from Dr. Jonathan Blasius, husband of the ZBA deputy chairperson.  Dr. Blasius, who is not an engineer, stated during a ZBA meeting on October 20, 2016 that he purchased a Blue Wireless phone, drove throughout the Village, and did not experience any dropped calls.  ROD 516.  According to the Reasoned Elaboration, Plaintiffs informed the ZBA that roaming agreements allow Blue Wireless to provide service in the Village without dropped calls.  ROD 2248.  Plaintiffs also now argue that Blue Wireless's FCC license allows, and the Telecommunications

Act of 1996 ("TCA") encourages, construction of its own network to address coverage gaps so that it need not rely on roaming agreements.

With respect to the height of the proposed tower, the ZBA found:

> Based upon propagation maps generated by the consultant, the [ZBA] determined that if a single tower solution was required, which they did not find supported the Applicant's submission, then alleged gaps in coverage would have been substantially filled by a Tower of less than the 180 feet requested. [ZBA] members found the propagation maps would only support a need at the lowest height modeled at 150 feet. The Village requested the applicant to generate propagation maps at 10 foot intervals from 180 to 100 feet. However, the applicant did not adhere to the request, and only produced propagation maps down to the 150 foot height. The Applicant also never conducted drive testing to corroborate their modeling . . . . [I]t appears the bulk of the projected identified gap areas are beyond the boundaries of the Village . . . . With the limited modeling provided, and the refusal to consider multiple tower/transmitter location[s], the minimum height below 150 feet required to close the modeled coverage gap in the Village cannot be determined.

ROD 2250-2251. Plaintiffs contest Defendants' interpretation of the RF data. The data submitted by Plaintiffs to the ZBA speaks for itself, and shows decreases in both population and geographic coverage below 180 feet. ROD 429-430, 567-577. Plaintiffs also contend that drive test data was not mandated by the applicable Village ordinance. Defendants submit that drive test data was required in order to assess the statement of necessity and the reliability of Plaintiffs' computer modeling.

12

The Reasoned Elaboration further concluded, in part, that the Hunt Road site in the Town of Busti remained available.

> With regard to the Hunt Road Water Tower Site the applicant's consultant represented he considered and rejected the same based upon lack of likely coverage, however no propagation maps accompanied the assertion. Subsequent review of records obtained from the Town of Busti revealed that the Water Tower had previously been determined to provide coverage throughout the Village of Lakewood in a similar frequency range with a Tower at 130 feet. The prior application to build on the site was approved by the Town, but the Tower was never built, and the site remains available.

ROD 2250. Plaintiffs have offered evidence outside the record, in the form of an expert affidavit, stating that the Hunt Road site is too far away from the Village center to provide reliable coverage to the target area and would cause network interference issues as it is too close to Blue Wireless's nearby facility. Those are the same conclusions discussed in counsel's December 30, 2016 letter. ROD 804. Defendants object to the expert's affidavit as beyond the administrative record.

It is undisputed that there are no existing towers or tall structures within the Village that could be used for co-location by Blue Wireless to achieve its coverage objective. ECF No. 41-1 at 27, ¶ 108. It is also undisputed that Plaintiffs agreed to build a "monopole," as opposed to a lattice tower design, and that the Village could choose the color of the tower. ECF No. 41-1 at 38, ¶ 133. At the hearing before the ZBA, the Chief of the Lakewood Fire Department commented that his fire company's

13

property was located in one of the most obscure places in the Village, in woods that are off limits to the public. ROD 2063. His comments echoed the initial sentiments of three Village Board members.

Nonetheless, the Reasoned Elaboration stated that the Lakewood Fire Department is "within the view-shed of multiple passive and active outdoor recreational areas." The Reasoned Elaboration concluded that

> The proposed Project [] is more than three times taller than the trees in the Village, and six times the height of that allowed for any structure in a residential zone. . . . The area in question appears to be in close proximity to Federal and New York State wetlands. . . . It is also adjacent to land approved for the development of a linear park under the Village's 2017 adopted Comprehensive Plan. It is also within 500 feet of the Crescent Creek water quality improvement project being developed by the Village with funding from New York State. The Crescent Creek restoration project provides a nature trail along a wetlands reconstruction project to improve water quality along Crescent Creek with discharges to Chautauqua Lake.

ROD 2247. The Reasoned Elaboration further opined:

> The Village's character as a well preserved quaint concentration of low elevation pre-WWII structures is one of the characteristics that makes it a seasonal destination. The Village has and is developing interconnected parks, bikeways, and greenways to make the Village a seasonal destination. The development of the single pole 180'[,] six times the height of a permissible structure in the residential zone, and three times the height of the tree tops is inconsistent with the enjoyment of nature in the Lakefront community which makes the Village unique, and attractive to the summer residents which support the local economy.

ROD 2251.

Plaintiffs argue that the only evidence concerning aesthetics consisted of their own photo simulations depicting the appearance of the tower from 48 different locations. Plaintiffs also contend that there was no evidence to show that the proposed tower would have an adverse impact on tourism in the Village.

## Discussion

### I. Telecommunications Act and Standard of Review

The TCA provides that no State or local law may prohibit or have the effect of prohibiting "the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Within that fundamental framework, federal law does allow for "substantial local control over siting of [wireless telecommunication] towers." *Omnipoint Commcn's, Inc. v. City of White Plains*, 430 F.3d 529, 531 (2d Cir. 2005) (quoting *Town of Amherst, N.H. v. Omnipoint Commc'ns Enters., Inc.*, 173 F.3d 9, 13 (1st Cir. 1999)). "Although the TCA preserves local zoning authority in all other respects over the siting of wireless facilities, [47 U.S.C.] § 332(c)(7)(A), 'the method by which siting decisions are made is now subject to judicial oversight.'" *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 637 (2d Cir. 1999) (quoting *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 492 (2d Cir. 1999)).

The TCA requires that any local zoning authority's denial of an application to construct a wireless facility be "in writing

and supported by substantial evidence" in the record. 47 U.S.C. § 332(c)(7)(B)(iii). The decision must articulate its reasons for denying an application "so that no one has to parse a record and guess which of the things [the local government] mentioned therein was ultimately found persuasive." *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 554 (S.D.N.Y. 2009).

"Whether an administrative agency determination is shored up by substantial evidence is a question of law to be decided by the courts." *Willoth*, 176 F.3d at 645 (quoting *300 Gramatan Ave. Assocs. v. State Div. of Human Rights*, 45 N.Y.2d 176, 181 (1978)). To determine whether substantial evidence supports a decision, a court "must employ 'the traditional standard used for judicial review of agency actions.'" *Town of Oyster Bay*, 166 F.3d at 494 (quoting H.R. Conf. No. 104-458, at 208 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 223). Substantial evidence requires "less than a preponderance, but more than a scintilla of evidence [and] 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Universal Camera v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotations omitted in original)). When determining whether there is "substantial evidence" to support a denial, courts "must view the record in its entirety, including evidence opposed to the [municipality's] view, and 'may neither engage in [its] own

16

fact-finding nor supplant the [municipality's] reasonable determinations.'" *T-Mobile Northeast LLC v. Town of Islip*, 893 F. Supp. 2d 338, 354 (E.D.N.Y. 2012) (quoting *Town of Oyster Bay*, 166 F.3d at 494).

Although "[t]he TCA clearly establishes procedural requirements that local boards must comply with in evaluating cell site applications . . . the TCA does not 'affect or encroach upon the substantive standards to be applied under established principles of state and local law.'" *Town of Oyster Bay*, 166 F.3d at 494  (quoting *Cellular Tel. Co. v. Zoning Bd. of Adjustment*, 24 F. Supp. 2d 359, 366 (D.N.J. 1998)).  The applicable local law in this case is the Village Code, which sets forth the requirements for obtaining a variance.  Additionally, New York State law provides that wireless service providers "are afforded the status of public utilities for the purposes of zoning applications[.]" *Town of Islip*, 893 F. Supp. 2d at 355. Accordingly, local boards must evaluate an application for telecommunications facilities under the "'public necessity'" standard and evaluate it "on the basis of whether the public utility has shown a need for its facilities and whether the needs of the broader public would be served by [approving the application]." *Sprint Spectrum L.P. v. Bd. of Zoning Appeals of Town of Brookhaven*, 244 F. Supp. 2d 108, 114 (E.D.N.Y. 2003) (citing *Town of Oyster Bay*, 166 F.3d at 494).

Courts have interpreted the "public necessity" standard to require that wireless service providers establish "(1) that there are gaps in service, (2) that the location of the proposed facility will remedy those gaps and (3) that the facility presents a minimal intrusion on the community[.]" *New Cingular Wireless PCS, LLC v. Town of Fenton*, 843 F. Supp. 2d 236, 245 (N.D.N.Y. 2012) (citations and quotation marks omitted). "As a general rule, if the public utility makes the required showing, which necessarily means the record is devoid of substantial evidence to support a denial, the [application] must issue." *Town of Islip*, 893 F. Supp. 2d at 355 (citing *Town of LaGrange*, 658 F. Supp. 2d at 555). However, "[i]f the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed." *Id.* (quotation marks and citation omitted).

## II.  Summary Judgment Motions

Both parties have moved for summary judgment. As discussed above, the facts of this case are based on the administrative record. Plaintiffs' motion argues that the Defendants' denial was untimely and is not supported by substantial evidence. Defendants have opposed Plaintiffs' summary judgment motion, and have submitted their own cross-motion in which they focus primarily on the timeliness question.

### A.  Timeliness

Plaintiffs first argue that the Court should grant their permits because Defendants took too long to produce a decision. Plaintiffs base their argument on "shot clock" deadlines established by the Federal Communications Commission ("FCC"). Section 332(c)(7)(B)(ii) of the TCA provides that a local zoning authority must act on an application "within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request." 47 U.S.C. § 332(c)(7)(B)(ii). The FCC has established a presumption that a "reasonable period of time" means "90 days to process personal wireless service facility siting applications requesting collocations, and . . . 150 days to process all other applications." *See In the Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(b)*, 24 F.C.C. Rcd. 13994, 14005 (2009) ("Shot Clock Order"). The presumption is rebuttable, and can be extended with the mutual consent of the parties. *Id.* at 14005, 14013. The FCC also determined that when a local authority requests additional information, the response time may be excluded from the 90-day or 150-day time period, but "only if that State or local government notifies the applicant within the first 30 days that its application is incomplete." *Id.* at 14015.

Plaintiffs argue that there were a number of violations of the FCC shot clock in this case. First, they submit that their

application should have been deemed filed when it was first submitted in April 2016, and that there was no notice within 30 days, aside from a demand for $8,500 in escrow money, that the application was incomplete. While Plaintiffs acknowledge the agreement to extend the shot clock to December 16, 2016, they object to Defendants' failure to provide a decision until February 23, 2017. Defendants counter that any shot clock period should not have commenced until September 7, 2016, when the Board decided to move ahead with the application despite uncertainty about whether it had been "duly" filed, and that the agreed-upon 60-day extension, when added to the applicable "shot clock" period, carried the deadline into April 2017. Defendants also allege that Plaintiffs failed to provide certain requested information, and that any resulting delays were reasonable.

The ZBA issued a written decision shortly after Plaintiffs brought this action for injunctive relief. The FCC has stated that a "local authority's exceeding a reasonable time for action would not, in and of itself, entitle the siting applicant to an injunction granting the application." Shot Clock Order, 24 F.C.C. Rcd. at 14005 n.99. Instead, numerous federal district courts have determined that the most reasonable relief is to require a written decision. *See Crown Castle NG E. Inc. v. Town of Greenburgh*, 2013 WL 3357169, at *17 (S.D.N.Y. July 3, 2013) ("the only reasonable [equitable] relief for such a failure

[would be] to require a written decision, which [the Town] ha[s] already provided"), *aff'd*, 552 F. App'x 47 (2d Cir. 2014); *see also Omnipoint Commc'ns, Inc. v. Vill. of Tarrytown Planning Bd.*, 302 F. Supp. 2d 205, 214 n.7 (S.D.N.Y. 2004) (claim for injunctive relief mooted by denial of application); *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 99 F. Supp. 2d 381, 394 (S.D.N.Y. 2000) (claim of delay mooted because "[p]laintiffs [could] no longer make the claim that the delay had the effect of denial of wireless services").  Because in this case the ZBA issued a decision, which in turn gave rise to the Amended Complaint, Plaintiffs' request for injunctive relief on the basis of an untimely decision is **denied** as moot.

## B.  Application Denial

Plaintiffs next argue that the ZBA's denial of their permit application was improper.  As set forth above, in order to obtain zoning approval a wireless services provider must show (1) gaps in service, (2) that the proposed facility will remedy those gaps, and (3) that the facility presents a minimal intrusion on the community.  *Town of Fenton*, 843 F. Supp. 2d at 245.

### 1. Significant Gap

The gap requirement precludes "denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines."  *Willoth*, 176 F.3d at 643.

"[I]f an applicant's proposal is not the least intrusive means of closing a significant gap in coverage, a 'local government may reject [the] application . . . without thereby prohibiting personal wireless services. . . .'" *T-Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp. 2d 446, 456-57 (S.D.N.Y. 2009) (quoting *Willoth*, 176 F.3d at 643). *Willoth* noted that a site may not be the least intrusive means to satisfy the coverage gap if the record shows there is a "less sensitive site" available, the plaintiff could "reduce the tower height," or plaintiff could use a "preexisting structure" to address the gap. 176 F.3d at 643 (citations omitted). That said, "[w]here the plaintiff's existing proposal is the only feasible plan to close the relevant coverage gap, it seems evident that no less intrusive means is possible, and the application must be granted." *Town of Ramapo*, 701 F. Supp. 2d at 457.

Here, both parties placed evidence into the record relevant to cell phone coverage. Plaintiffs relied primarily upon RF data, which showed in-building and in-vehicle coverage gaps in the Village at tower heights lower than 180 feet. Courts have accepted RF data as evidence of a significant gap. *See, e.g., Nextel Partners, Inc. v. Town of Amherst*, 251 F. Supp. 2d 1187, 1191, 1196 (W.D.N.Y. 2003).

The Reasoned Elaboration criticized Plaintiffs for failing to provide evidence of dropped network calls either within the

Village or along major and minor arterial roads.  Specifically, the Reasoned Elaboration noted the lack of "drive testing" such as that performed by Dr. Blasius.  ROD 2248.  As noted above, Plaintiffs explained that calls would not be "dropped" because of the company's roaming agreements with other providers.

Defendants argue in part that because Blue Wireless customers are able to obtain coverage through roaming, there is no need for an additional tower.  ECF No. 41 at 6.  Plaintiffs contend that although they have been able to provide roaming coverage through another carrier, Blue Wireless itself has significant gaps in coverage.  In sum, Defendants submit that from the customer's perspective there are no gaps, while Plaintiffs counter that from the provider's perspective significant gaps exist.

Prior to 2009, courts held divergent views as to whether a gap must be determined from the perspective of a cell phone customer or from the perspective of the provider.  *Compare Nextel W. Corp. v. Unity Twp.*, 282 F.3d 257, 265–66 (3rd Cir. 2002) (favoring customer's perspective) *with Second Generation Properties, LP v. Town of Pelham*, 313 F.3d 620, 633-35 (1st Cir. 2002) (favoring provider's perspective); *see also Omnipoint Commcn's*, 430 F.3d at 535 n.3 (noting that the question of perspective was "unsettled").  In 2009, the FCC rejected the user-based approach, and instead determined that State and local

authorities cannot prohibit "the provision of services of individual carriers solely on the basis of the presence of another carrier in the jurisdiction." Shot Clock Order, 24 F.C.C. Rcd. at 14017. In doing so, the FCC cited Section 332(c)(7)'s use of the plural in "personal wireless services," the policy goal of not "leav[ing] segments of the [local] population unserved or underserved," and the TCA's goal of "promoting the construction of nationwide wireless networks by multiple carriers." *See id*. The FCC also acknowledged local authority "where a *bona fide* local zoning concern, rather than the mere presence of other carriers, drives a zoning decision." *Id.* The FCC ruling cited with approval the First Circuit's decision in *Town of Pelham*, where the court rejected the argument that "if any coverage is provided in the gap area by any carrier (including roaming service through a tower in a different town) then there can be no effective prohibition." 313 F.3d at 632 n.13. Courts have held that the FCC's interpretation of the statute is entitled to *Chevron* deference. *See Town of Greenburgh*, 2013 WL 3357169, at *19.

The Reasoned Elaboration does not dispute that according to Plaintiffs' RF data, there are gaps in Blue Wireless service in the Village. While other carriers may be providing service for their customers within the Blue Wireless coverage gaps, and may also provide roaming for Blue Wireless customers, significant

gaps exist from the perspective of the provider.  The Court
therefore finds that the Reasoned Elaboration's finding of no
significant gap was not supported by substantial evidence.

### 2.    Feasability and Intrusiveness

#### a.    Siting

With respect to siting, Plaintiffs highlight their numerous
efforts to identify a feasible, unintrusive site.  In searching
for a feasible site Plaintiffs reportedly assessed at least nine
alternatives (including two co-location sites).  Plaintiffs'
initial application identified a central site that received
negative feedback from the Village.  When Plaintiffs asked the
Board to suggest specific sites, the Board declined due to its
lack of knowledge about telecommunications coverage.

Defendants submit that they asked Plaintiffs to provide
proof of their search process and that Plaintiffs failed to
provide any such documentation.  Defendants also suggest that
they were misled about alleged communications between Plaintiffs
and the school superintendent with regard to the bus garage site.
Plaintiffs subsequently clarified that an inquiry about leasing
the school bus garage site was emailed to the President of the
District Board of Education, who did not reply.  ROD 803.

Defendants are also critical of Plaintiffs' evaluation of
the various sites.  Their briefing asserts in part that over 27%
of the Village is zoned such that a cellular telephone tower

would not need a variance.  The record shows, however, that Plaintiffs explored sites both within and outside such zoned areas.  The ZBA also asked Plaintiffs to consider a multiple-site placement.  In the letter dated December 30, 2016, Plaintiffs' counsel responded that there were no co-location opportunities, and that a multi-site construction would impose "an undue economic burden."  ROD at 805.  Reasons for excluding existing structures were discussed with the ZBA.  ROD 758-759.

The Reasoned Elaboration concluded that instead of the Glenwood Avenue site, a facility at the Hunt Road site in the Town of Busti would be more feasible.  The Town of Busti site was formally proposed by Mr. Comi at the final ZBA hearing.  The validity of Mr. Comi's, and correspondingly the ZBA's, conclusions about the Hunt Road site are highly questionable.  As Plaintiffs point out, there is little evidence that the 2003 application relied upon by Mr. Comi and the ZBA was materially similar to the application at issue here.  Furthermore, Mr. Comi offered no present-day evidence that the Hunt Road site would be feasible.  *See New York SMSA Ltd. P'ship v. Town of Oyster Bay*, 2013 WL 4495183, at *18 (E.D.N.Y. Aug. 16, 2013)("The Board is required to support its decision with substantial evidence that the alternative sites were feasible.").

"[T]he Court must ascertain whether there is substantial evidence to support the Board's finding that alternative sites

were not investigated properly, based on evaluation of the entire record, including opposing evidence." *New York SMSA Ltd. P'ship v. Town of Oyster Bay Zoning Bd. of Appeals*, 2010 WL 3937277, at *6 (E.D.N.Y. Sept. 30, 2010); *see New York SMSA Ltd. P'ship v. Inc. Vill. of Mineola*, 2003 WL 25787525, at *9 (E.D.N.Y. Mar. 26, 2003) (a court must look at the whole record to determine if "there is substantial evidence to support the Board's finding that alternative sites were not investigated properly").  Here, Plaintiffs tabled consideration of their initially-proposed site, sought input from the Village, followed suggestions from the Mayor, explored multiple sites, and identified a location that several Board members initially deemed appropriate.  While the Hunt Road site was proposed as an alternative, the present-day feasibility of that site was not established.  Consequently, substantial evidence does not support the Reasoned Elaboration's conclusion that Plaintiffs' siting efforts were insufficient. *See New York SMSA Ltd. P'ship v. Town of Oyster Bay*, 2013 WL 4495183, at *18 (noting that "[t]he law only requires a plaintiff to engage in a good faith effort to evaluate alternative sites" and that such requirement was met when the plaintiff submitted reports that discussed eight alternative locations); *cf. Town of Fenton*, 843 F. Supp. 2d at 254.

### b.  Aesthetics

The Reasoned Elaboration's most detailed objection is to the

proposed tower's aesthetic impact. With little record evidence
in support, the Reasoned Elaboration states that the Glenwood
Avenue site is "within the view-shed of multiple passive and
active recreational areas." ROD at 2243. The Reasoned
Elaboration also generally describes the facility as "out of
scale, incongruous, and overwhelming," as well as "inconsistent
with the enjoyment of nature." ROD at 2246, 2251.

The Village of Lakewood is a popular summer recreation area,
in large part because of its location on Chautauqua Lake.
Consequently, concerns about aesthetics may be particularly
acute. The Second Circuit has held, however, that "generalized
expressions of concern . . . cannot serve as substantial
evidence" to support denial of a wireless provider's application.
*Town of Oyster Bay*, 166 F.3d at 496; *see also Town of Ramapo*, 701
F. Supp. 2d at 462 (concluding that the Town's concerns "were
generalized and failed to identify specific aesthetic problems").
Furthermore, "[s]peculative concerns about the 'potential
visibility' of a proposed tower are unlikely to constitute
substantial evidence for denying an application absent some form
of objective support in the form of 'photographs, site plans,
surveys, and the like.'" *T-Mobile Northeast LLC v. Town of
Islip*, 893 F. Supp. 2d 338, 358–59 (E.D.N.Y. 2012) (quoting *Green
Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 54 (1st Cir.
2012)).

"To deny a siting application on aesthetic grounds, there must be substantial evidence: (1) that 'residents will be able even to see the antennae' and (2) there will be an actual 'negative visual impact on the community.'" *Id.* at 358 (quoting *Town of Oyster Bay*, 166 F.3d at 496). "[B]ecause it would be a rare event to be able to buffer a communications tower so that it is not visible at all, and few people would argue that telecommunications towers are aesthetically pleasing, courts tend to require objective evidence of a negative visual impact that is grounded in the facts of the case." *Id.* at 359 (internal quotations omitted).

The strongest evidence of aesthetic impact was submitted by Plaintiffs in the form of photo simulations. Those simulations, utilizing the balloon float, show the tower's visibility from 48 different locations around the Village. ROD 580-679. Defendants contend that the photographs are inadequate because they do not include waterfront vantage points. Although the photo simulations were provided at the request of the ZBA, the ZBA did not ask Plaintiffs to provide simulations from any specific locations. Indeed, when the question of a balloon float was raised, Plaintiffs' representative explained that it would provide photographs from numerous locations, and there was no suggestion at the time that particular locations be included. ROD 527.

Defendants' conclusions with respect to aesthetics rely primarily on current and expected recreation in the area. The Reasoned Elaboration refers to the proposed tower site as "adjacent to" outdoor recreation fields and a potential future "Linear Corridor Park." It is undisputed that the recreation fields are several hundred feet away from the proposed tower location, on property that currently contains an 80-foot fire training tower. ECF No. 41-1 at 40, ¶ 136. The Village's Comprehensive Plan, which was not adopted until after Plaintiffs filed their 2016 application, discusses a linear corridor to be developed in the future near existing railway tracks: "[w]hen rail service is no longer necessary, the corridor should be acquired and turned into a linear park with a multiuse trail surrounded by a thin tree-lined buffer." ROD Item 71, at 99.[3] The Court questions whether such speculative language carries much weight in the substantial evidence analysis. In any event, the record shows that the proposed linear park (railroad line) is adjacent to the Village's developed commercial district. ECF No. 41-1 at 40, ¶ 136.

The Reasoned Elaboration also makes reference to nearby wetlands and the Crescent Creek Wetlands Restoration Project. ROD 2245. Specifically, the Elaboration states that "[t]he area

---

[3] The Village of Lakewood Comprehensive Plan is located at http://www.lakewoodny.com/complandraft.pdf, and is referenced in the ROD Table of Contents as Item 71.

in question appears to [be] in close proximity to Federal and New York State wetlands." ROD 2247. Defendants do not contend that the tower itself is to be built on wetlands, or that any of the proposed construction will involve dredging or other activities on wetlands. On February 23, 2017, counsel for Plaintiffs offered the ZBA a Wetland Delineation/Determination Report allegedly establishing that the project site is 450 feet from any wetlands. ROD 2255. The ZBA noted receipt of the report. *Id.*

As evidenced by Plaintiffs' photo simulations, the proposed tower will be visible from various locations in the Village. That said, the Reasoned Elaboration makes no reference to other objective evidence of a negative visual impact. In the Second Circuit, evidence of aesthetic injury may include "objections raised by neighbors who know the local terrain and the sightlines of their own homes." *City of White Plains*, 430 F.3d at 534. "Other evidence can include 'beautification efforts' or the 'actual character of the immediate neighborhood.'" *Town of Islip*, 893 F. Supp. 2d at 359 (quoting *T-Mobile Central, LLC v. Unified Gov't of Wyandotte County*, 546 F.3d 1299, 1312 (10th Cir. 2008)). Here, the Reasoned Elaboration makes reference to efforts to bury power lines in the Village as it approaches the waterfront, but it is not clear whether those efforts extended to the Glenwood Avenue area. ROD 2251. Aside from the recreational concerns discussed above, which are largely generalized, the

Reasoned Elaboration cites little evidence, and certainly less than substantial evidence, to support its finding of aesthetic harm.

### c. Tower Height

Relevant to both feasability and intrusiveness is the matter of the tower's height.  The Court is sensitive to the fact that a 180-foot monopole will be several times taller than any tree or building in the Village.  Plaintiffs have supported their argument for a 180-foot tower with RF propagation maps. Initially, they provided data for towers at 180 feet and 150 feet to show that a 150-foot tower was inadequate.  At the request of the ZBA, they submitted additional maps showing existing and proposed coverage from the Glenwood Avenue site at descending 10-foot intervals between heights of 180 and 150 feet.  ROD 567-577. The Village conceded that those maps "do highlight variances in coverage areas between 180 feet and 150 feet."  ROD 2251.

Although the Village concluded that "the bulk" of the gap areas extended beyond the boundaries of the Village, ROD 2251, the RF propagation maps show the existing gaps within the Village, and that a 180-foot tower would address the target geographic and population goals.  The RF data also indicates that coverage decreases significantly with each 10-foot reduction in tower height.  ROD 575, 709-711.

The Reasoned Elaboration concluded that the height of the

proposed tower could have been reduced by using a second
transmitter such as the one modeled at the Village's clock tower.
ROD 2251. This finding contradicts the ZBA's prior discussion
with Plaintiffs' counsel, wherein counsel explained that the
clock tower was too low and that its close proximity to the
Glenwood Avenue tower would actually result in interference, thus
providing poor quality service. ROD 758-759. Similarly, the
Reasoned Elaboration criticizes Plaintiffs for failing to model
their tower height at maximum signal strength, ROD 2248, yet the
record again reflects a letter from Plaintiffs' counsel
confirming that the propagation maps were prepared at maximum
power output. ROD 800. The Court therefore finds that the
Reasoned Elaboration's conclusion with respect to tower height
was not supported by substantial evidence.

C.    **Injunctive Relief**

The Second Circuit has held that an injunction is the proper
remedy for violations of the TCA. *Cellular Telephone Company v.
The Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir. 1999); *see
Town of Ramapo*, 701 F. Supp. 2d at 463 ("[U]nder *Willoth*, a
violation of the effective prohibition provision requires
injunctive relief: an application proposing the least intrusive
means for closing a significant coverage gap cannot be denied—or,
put differently, it must be granted."). Because the Court finds
that the Village's determination was not supported by substantial

evidence, it will provide Plaintiffs their requested injunctive relief and, as set forth below, order the Village to grant the necessary permits and approvals.

## III. Other Pending Motions

Two additional motions are pending before the Court, both of which relate to the summary judgment filings.  First, Plaintiffs have moved to strike Defendants' allegedly-untimely submission of their statement of undisputed materials facts.  ECF No. 47. Defendants did not submit such a statement with their summary judgment motion, as required by this Court's Local Rules, and instead filed it with their reply memorandum.

The facts set forth in the statement of undisputed facts are fundamentally the same as those stated in the body of Defendants' motion for summary judgment.  Consequently, while Plaintiffs can argue procedural error, they cannot claim prejudice. Furthermore, since the Court is denying Defendants' summary judgment motion, the propriety of their factual statement is moot.  The motion to strike is therefore **denied.**

Plaintiffs also ask the Court to strike a statute of limitations argument set forth in Defendants' reply memorandum. That same statute of limitations argument is asserted in Defendants' motion for leave to file an Amended Answer.  The substance of the statute of limitations argument is that if the Court adopts Plaintiffs' calculation of the "shot clock" and

deems the administrative action as commencing in April 2016, the "shot clock" expired in December 2016 and Plaintiffs failed to file their federal Complaint within 30 days of that date as required by statute.

Plaintiffs submit that Defendants have miscalculated, and that their filing of the Complaint on January 17, 2017 was timely. In any event, the Court has deemed the "shot clock" issue moot and has not accepted either party's arguments as to the dates of commencement or expiration. Moreover, the TCA provides that "[a]ny person adversely affected by any final action or failure to act" shall file an action "within 30 days after such action or failure to act," 47 U.S.C. § 332(7)(B)(v). Here, Plaintiffs filed their Amended Complaint with respect to Defendants' "final action," being the issuance of the Reasoned Elaboration, within the 30-day limitations period. Accordingly, Defendants' motion for leave to file an Amended Answer is **denied**, and Plaintiffs' motion to strike the advancement of new arguments in a reply brief is **denied** as moot.

## Conclusion

For the reasons set forth above, the Plaintiffs' motion for summary judgment is **granted** and the remaining pending motions are **denied.** Defendants shall, within 45 days of the date of this Order, grant Plaintiffs' application and issue the special use permit and/or variance and such other permits or licenses which

are necessary to install the wireless telecommunications tower which is the subject of this action.

DATED at Burlington, in the District of Vermont, this 6th day of January, 2020.

<u>/s/ William K. Sessions III</u>
William K. Sessions III
District Court Judge